Filed 3/24/14  P. v. Belvis CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EDGAR R. BELVIS,<br><br>        Defendant and Appellant. | A136843<br><br>(Sonoma County<br>Super. Ct. No. SCR615002) |

## I. INTRODUCTION

Appellant pled guilty to five charged counts, including attempted kidnapping to commit rape, assault with intent to commit rape, and assault with a deadly weapon.  The trial court sentenced him to 15 years in state prison.  He appeals, claiming that his guilty plea was involuntary and that the sentence imposed by the trial court exceeded that noted in the open plea agreement.  We remand the matter to the trial court with instructions to clarify an ambiguity in the record relating to the sentence to be imposed on appellant and, if necessary, resentence appellant.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A.     *The Charged Offenses*

Appellant, then 56 years old, lived with his sister and the victim, Jane Doe, then 23 years old, in a house in Santa Rosa, Sonoma County.  He had moved into that house about four months earlier, having come to California from his home in the Philippines in October 2011, apparently on a tourist visa.  He was employed as an engineer at a power plant in the Philippines.

1

On the day in question, February 24, 2012, the Santa Rosa police were notified that an injured woman at Memorial Hospital in that city, i.e., Doe, had reported an assault and an attempted rape on her earlier that day, acts committed on her by appellant. She apparently described these events in "exhaustive detail" to both the hospital staff and the Santa Rosa police.[1]

They were, in short, that about four months before the charged offenses, appellant had begun "making advances" toward her, including kissing her on the cheek when she was asleep on her mother's couch, and sending her text messages telling her that he "liked her in a different way." Doe tried to discourage these advances by reminding appellant of his family and children in the Philippines. Further, after a text message from appellant that he liked her and loved her, Doe sent appellant a message telling him to "fuck off."

The following morning, however, when the two of them were alone in the house and Doe was using a computer in the kitchen, appellant approached her from behind, grabbed her by the neck, and pulled her toward him. He was, at the time, carrying a long kitchen knife in his right hand; he said to Doe: "I have wanted to do this for a long time" and "don't fight me or I will slice your neck." Hugging her from behind and with the knife under her neck, appellant pushed her up the stairs of the apartment. As he was doing so, he rubbed his groin against her body and grabbed one of her breasts. But Doe was able, while part way up the stairs, to push against the wall with her feet, and they both fell down the stairs. Appellant immediately got on top of Doe and started strangling her with both hands; he then gripped the kitchen knife and told her he wanted to kill her. He also used a closed fist to punch the side of her head several times. Doe attempted to remove appellant's hands from her neck, told him to "think about your children," and managed to trip him so that she could stand up. But appellant forced her to go higher up the stairs again, all the time holding onto her jacket.

---

[1] The following summary of the facts of the crimes committed is derived from a presentence report prepared by the Sonoma County Probation Office.

Doe was able to push away from appellant, however, and got back down to the first step of the stairs. Appellant then straddled her from behind with an arm holding the knife around her neck and the fist on his other arm being used to punch Doe in the head; the blows were so hard and painful that Doe thought appellant was trying to knock her unconscious.

While the two were lying at the bottom of the stairs, appellant began to kiss Doe's neck, and did so for about 15 seconds. Doe rolled onto her stomach and appellant got on top of her again, and pushed her head to the floor while still holding, Doe believed, the knife.

The couple struggled more, by then on the ground floor, and Doe tried, but was unable, to get out via a sliding glass door. While that was happening, Doe was able to grab the handle of the knife appellant was using, but her hand slipped to the blade, and her finger was cut. Doe was able to move to the front door, opened it a small distance, but was unable to leave because appellant pushed a couch in front of the door. However, Doe was briefly able to get her hand out the door, resulting in the door being stained with blood. She shouted outside for help, but no one apparently heard her, and appellant was then able to get the front door shut.

Doe then ran to the kitchen door, but she was unable to open it before appellant caught her again. Doe then realized that the less she resisted, the less force appellant used on her. She then pretended to have given up and to allow appellant to have sex with her. She asked him: "Do you just want to have sex?" Appellant responded: "Yes." But, using the blood already on her hand from appellant's knife as a lubricant, Doe was able to escape from appellant's grip and then escape from the house. She ran outside, barefoot and in shock, shouting for help. One of the neighbors came to a window and asked what was happening. Doe responded that someone was trying to kill her, and she was allowed into the neighbor's house; that neighbor then called 911. That same neighbor noted that she could see appellant looking at them through a window in his house.

3

When the police arrived they found blood spattered on several walls of Doe's mother's house and Doe having difficulty breathing, and repeatedly stating that: "He tried to kill me."

When Doe was examined by the hospital staff, she was found to have a major laceration to a finger, a "red and tender" neck, significant scalp swelling, and multiple secondary contusions and abrasions. She was in the emergency department several hours, and then was kept in the hospital overnight because of nausea and other "post-concussive" symptoms.

Appellant was taken into custody and transported to the Santa Rosa police station. He was able to communicate with the police, although speaking English with a "thick accent." He said he and Doe had been arguing about him "courting" her and his making a "proposal" to her. Eventually, though, he acknowledged sending her the text message asking her to be his girlfriend and becoming angry when he received her "fuck you" reply. He further acknowledged that he confronted her, and used a knife while doing so, the next morning. He told her that her message made him a "fool" and told her to "go upstairs" with him because he wanted to "fuck her" because of the message she had sent him. He also acknowledged using the knife to force Doe up the stairs, but that they fought and fell to the floor, and she later ran out the door.

During the course of his interview with the police, appellant acknowledged (1) holding the knife against Doe's side, (2) using a closed fist to punch her in the back of the head to keep her from getting the knife, (3) putting his hands on Doe's neck three times and applying pressure in so doing, (4) getting angry at Doe during their struggle, (5) telling Doe he would kill her as they fought on the carpet, and (5) conceding to the police that he deserved to go to jail.

On April 23, 2012, an information was filed in Sonoma County Superior Court charging appellant with five counts, i.e., attempted kidnapping to commit rape, assault with intent to commit rape, assault with a deadly weapon, threats of death or great bodily injury, and assault by means of force likely to produce great bodily injury. (Pen. Code, §§ 209, subd. (b)(1), 664; § 220, subd. (a); § 245, subd. (a)(1); § 422; § 245, subd. (a)(4).)

4

The information also alleged that appellant personally used a dangerous weapon and inflicted great bodily injury.

**B.    *Appellant's Plea and Sentence***

On June 26, 2012, the court conducted a brief hearing at which it set June 29 as the date for appellant to enter a plea. The court stated that it understood the prosecution had "offered a range between 10 and 15 years," but that both sides were "still talking." It then promised to "put on the record what the maximum and minimum [term] is [and] we'll see if we are going to trial or if you wanted to plead to whatever the offer is at that time."

On June 29, 2012, defense counsel stated that his client "plans to enter a plea to all the charges to the Court, pursuant to the discussions the Court and Counsel had in chambers." Defense counsel and the court then discussed whether they should use the English or Spanish version of the *Tahl*[2] waiver form. After a brief recess, during which those forms were apparently executed, proceedings resumed with the court addressing appellant. It said that both sides had agreed to a "plea to the sheet, essentially a plea to all the charges and enhancements . . . ."

According to the reporter's transcript, the court then said: "After speaking with the People and the defense, the Court was looking, although the maximum possible with full consecutive sentencing would be 31 years 8 months, the Court was indicating fairly that there would be a sentence somewhere between five and 10 years, probably closer to the lower end."[3]

After several other admonitions about the pleas he was about to enter, appellant personally agreed with the court that it had "fairly summarize[d] what you've been

---

[2] *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*).

[3] As noted in the Attorney General's brief, the first edition of the reporter's transcript of the June 29 hearing was determined to be incorrect. Among other things, that version incorrectly has the prosecutor, not the court, commenting on the consequences of appellant's plea of guilty to all the charges and, in the course thereof, mentioning—for the only time in all the proceedings—that the maximum term might be only 10 years.

advised about the possible outcomes of this case." Appellant then confirmed that he had read and understood the plea forms and verbally entered a plea of guilty to all the charged counts.

In contrast to the reporter's transcript, the clerk's transcript for the June 29 hearing specifically recites: "Court states this is an open plea, but the Court will consider 5 years to 15 years CDC." The *Tahl* waiver form says essentially the same thing; its paragraph 17, entitled "Indicated Sentence" reads: "I understand that, although the Court has indicated a sentence, there is no agreement with the District Attorney's Office and the Court will not decide what my sentence will be until it has read and considered a report from the probation office."

On August 16, 2012, the Sonoma County Probation Office submitted a detailed 14-page "Presentence Report" to the court in which it recommended that appellant receive a prison term of 24 years.

Appellant came on for sentencing before the court on October 4, 2012. At that hearing, the prosecutor stated that he felt "the court should impose the maximum of 15 years that was indicated in the Tahl waiver. I think that for a variety of reasons." After explaining those reasons, the prosecutor read a letter from victim Doe, and the court was next addressed by defense counsel, a deputy public defender. At the sentencing hearing, defense counsel did not object to any of the prior statements of the prosecutor, and indeed started his comments by saying: "Thank you, Your Honor. [¶] There is a range of 5 to 15 years. The District Attorney and Court agreed to a 15 year top and we agreed that the minimum sentence based on the counts pled would be 5 years." Counsel then argued the "mitigating factors" he believed there were, noted that appellant had a family in the Philippines to whom he would return after serving his sentence and, finally, that appellant was "an older man who has never been incarcerated before"—all by way of urging the court to not sentence appellant to the maximum term possible.

The court then made some fairly extended comments about the "very egregious crime" committed by appellant, the impact it had on victim Doe, and the fact that he "brutally beat her and she suffered tremendously not only emotionally, but physically

6

during that beating." After again reciting some of the "violent conduct" imposed on Doe by appellant, the court denied him probation and sentenced him to state prison for a term of 15 years. Again, defense counsel made no objection to that term, i.e., did not suggest that it was contrary to what had been either agreed to or suggested in any prior hearing.

On October 15, 2012, appellant filed a timely notice of appeal, accompanied by a request for a certificate of probable cause. That request was belatedly denied on March 26, 2013.[4]

### III. DISCUSSION

Appellant makes two basic arguments, namely, that (1) his guilty plea was legally involuntary because he was "induced to plead guilty" by the offer of a benefit, i.e., a promise that he would receive a sentence in the range of 5 to 10 years rather than the potential 31-plus-year sentence that he might have received, and (2) even if appellant's guilty plea was valid, this court should "specifically enforce" the "State's promise" to sentence appellant to a prison term of 10 years or less.

Both of these arguments rest on the premise that, at one point during the hearing on June 29, 2012,[5] the court told appellant that if he pled guilty his sentence would not exceed 10 years. In his opening brief in this court, appellant erroneously attributes this statement to the prosecutor, arguing that he was "induced to plead guilty by the prosecutor's representations regarding what the court would do . . . and his sentence was significantly more than that represented by the prosecutor . . . ." But, as noted above, the reference to a sentence "somewhere between five and 10 years" was not made by the

---

[4] As explained in our order in case No. A138081, i.e., appellant's petition for a writ of mandate, although the trial court ultimately denied appellant's request for the issuance of a certificate of probable cause, that denial was entered well beyond the 20 days required by California Rules of Court, rule 8.304(b)(2). We thus deem that denial to be invalid, and will therefore examine the merits of appellant's appeal.

[5] All further dates noted are in 2012.

prosecutor, but by the court itself, a point appellant's counsel emphasizes in his reply brief.[6]

In any event, appellant contends that, regardless who made the statement at the hearing, the record shows that he was inducted to plead guilty by the improper promise of a five to 10-year sentence. "In examining whether the trial court improperly induced a defendant's plea to what would otherwise be a lawful sentence, the key factual inquiries are whether the indicated sentence was more lenient than the sentence the court would have imposed following a trial and whether the court induced the defendant's plea by bargaining over the punishment to be imposed." (*People v. Clancey* (2013) 56 Cal.4th 562, 578 (*Clancey*).)

Alternatively, appellant contends that the reference to a sentence of between "5 and 10 years" is evidence of the prosecutor's promise and that this court should either order specific enforcement of that promise or allow him to withdraw his plea. In support of this argument, appellant cites Penal Code section 1192.5, which provides (among other things) that: "Where the plea is accepted by the prosecuting attorney in open court and is approved by the court, the defendant, except as otherwise provided in this section, cannot be sentenced on the plea to a punishment more severe than that specified in the plea and the court may not proceed as to the plea other than as specified in the plea."

The Attorney General argues that the single reference in this record to a sentence of "between five and 10 years," which was made at the June 29 hearing, was not an

_____

[6] In his reply brief, appellant contends, that the transcript of the June 29 hearing before the trial court was improperly corrected, because there was no showing of "who 'contacted' the court reporter 'in regard to this transcript' or what was conveyed during that contact" and California Rules of Court, rule 8.340(c) "requires that any augmentation or correction of the record be made via a motion of a party or on the court's own motion." But that rule simply provides that *the appellate court,* "on motion of a party or on its own motion . . . may order the record augmented or corrected . . . ." That rule clearly does not preclude a *superior court's* deputy clerk, via a declaration filed under penalty of perjury, from filing a reporter's transcript which had been corrected to reflect—and clearly correctly—that it was the trial judge, and not the Deputy District Attorney who was speaking about this case on June 29.

inducement or a promise. Preliminarily, the Attorney General believes that the statement was most likely a scriveners error: "Respondent has no explanation why the reporter's transcript states '10' rather than '15' years. Either the court misspoke, or the court's words were transcribed incorrectly. As the record has already been corrected once, and since no one in the courtroom reacted to the number '10,' arguably the fault lies with the court reporter."

Furthermore, respondent points out that both the reporter's transcript and the clerk's transcript contain material contrary to appellant's contention that the court indicated a 10-year maximum prison term. That material includes the clerk's transcript for the June 29 hearing, which reads: "Court states this is an open plea, but the Court will consider 5 years to 15 years CDC," and no suggested correction to that entry was ever proposed by appellant's trial counsel. Further, at the October 4 sentencing hearing, appellant's counsel started his argument to the court thusly: "Thank you, Your Honor. [¶] There is a range of 5 to 15 years. The District Attorney and Court agreed to a 15 year top and we agreed that the minimum sentence based on the counts pled would be 5 years." When, later at that hearing, the trial court sentenced appellant to 15 years, neither he nor his counsel objected on the basis that such a sentence was beyond the agreed-upon amount.

Finally, the Attorney General contends that even if the court did make the statement attributed to it in the reporter's transcript for the June 29 hearing, the five to 10-year sentence was at most an "indicated sentence," not a promise that a particular sentence would be imposed. Thus, making that statement did not divest the court of its discretion to impose a fair and just sentence at the sentencing hearing. (*Clancey, supra,* 56 Cal.4th 562.)

Very recently, our Supreme Court had before it a case with a somewhat similar factual background; it resolved an ambiguity in the record regarding the sentence imposed by the trial court by remanding the matter to that court. In *Clancey*, *supra,* 56 Cal.4th 562, the court reviewed a case involving a sentence imposed by a Santa Clara County trial court on a defendant who had, over the prosecution's objections, pled no

9

contest to several theft-related counts and had, via the trial court's dismissal of both a charged on-bail enhancement and an allegation of a prior strike conviction, been sentenced to only five years in prison. (*Id.* at pp. 568-569.) A divided panel of the Sixth District reversed the trial court, with the majority holding that what had occurred in that court was an improper judicial "plea bargain." In a lengthy but unanimous decision, our Supreme Court discussed "The Distinction Between an Unlawful Plea Bargain and a Lawful Indicated Sentence." (*Id.* at pp. 572-577.) Fortunately, we need not get into all this, but simply note that the court concluded that the record before it "is entirely ambiguous" on that point. (*Id.* at p. 578.) Thus, the court held, that the proper remedy was "a conditional reversal with directions to the trial court on remand to resolve the ambiguity." (*Ibid.*)

Because (1) the trial court's remark at the June 29 hearing creates an ambiguity regarding its indicated sentence in this case, and (2) both parties cite *Clancey* approvingly, we believe that, in the interest of justice, this case should be remanded to the trial court to clarify the ambiguity in this record regarding the meaning of the court's reference to a "sentence somewhere between five and 10 years . . . ." If the court determines that the reporter's transcript of the June 29 hearing is not correct in quoting it as stating that "there would be a sentence somewhere between five and 10 years," the court should order a correction made to that portion of the reporter's transcript and reinstate the judgment. If, however, the reporter's transcript is correct regarding that statement by the court, the court must clarify its indicated sentence in order to determine whether it is necessary to reconsider either appellant's plea or the sentence to be imposed on appellant.

## IV. DISPOSITION

We conditionally reverse the judgment and remand this matter to permit the trial court to resolve the ambiguity in this record and to review the sentence imposed on appellant as set forth above.

10

_____

Haerle, J.

We concur:

_____

Kline, P.J.

_____

Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11